The next case is Lowman v. Federal Aviation Administration Good morning, Mr. Tabor Good morning, Your Honors, and may it please the Court. My name is Stephen Tabor, and I represent the petitioners in this case. If you place a frog in a pot of boiling water, it will hop out immediately in order to save its life. However, if you place a frog in a tepid pot of water and turn up the heat gradually, it will remain in the pot of water until it's boiled to death. This is the situation that the residents of Lakeland find themselves in. In 2016, the respondents proposed a 50,000 square foot air cargo facility that would induce one air cargo flight a day. In 2018, without public notice, without public acknowledgment, without public comment, that air cargo facility was increased to 230,000 square feet and eight air cargo flights a day. Now, the proposed project that is before you and is the subject of the finding of no significant impact and record of decision exceeds to create an air cargo facility that is 640,000 square feet and 44 air cargo flights a day. This incremental change has allowed these incremental changes over the years has allowed the respondents to claim that there will be no significant impact on the environment and on the citizens of Lakeland. Nothing could be further from the truth. If the respondents had compared the 640,000 square foot air cargo facility with the situation prior to the 50,000 square foot, I have no doubt that... Let me ask you about that. So we have a phase one development and a phase two. And as I understand it, the statute of limitations, the only one that you're protesting is the phase two. But repeatedly in your brief, you're going back to before phase one. So I'm not sure how you get to sort of pull back in phase one. Why are we not just focused on phase two? Well, Your Honor, thank you for that question. The reason why it is important to understand the context, the historical context of this is the fact that this is the first opportunity the public has had to comment on this air cargo facility. That is the one that was proposed for the Amazon Air. I thought there was an opportunity to comment on phase one and no comments were received. Well, the FAA conflates the 2016 EA with the revalidation in 2018. The revalidation in 2018 is, in fact, the beginning of the Amazon Air Cargo Facility. That's when they sought to create or construct a 2,33,000 square foot facility with air cargo. There was no tenant involved in the 50,000 square foot facility that was the subject of the 2016 environmental assessment. But 2016, correct me if I'm wrong, 2016 they put it out for public comment, no comments are received. They reassess in 2018, but that's phase one. You've challenged phase two.  Phase one actually begins in 2018 with the revalidation. That's when things change and you get a much larger facility, many more air flights per day and this is all done under the table with no public comment, no public acknowledgement that it even exists. If they were just going to build a 50,000 square foot air cargo facility with one additional flight per day, we wouldn't be here. But the fact of the matter is that the respondents have used categorical exclusions and other administrative processes that keep the public out of the equation. But I'm looking at your petition right now and you are petitioning the U.S. Court of Appeals for the 11th Circuit for review of the FAA's finding of no significant impact in record of decision for phase two signed on October 29, 2021. You're continuing to talk about the reassessment in 2018. Correct. Explain to me why that's relevant when you're challenging the 2021 phase two. It's relevant because the public had no involvement in that and was unable to express its discontent. But that's still essentially part of phase one. I mean, it's an amended version of phase one, but it's still part of phase one. And I mean, are you taking the position that it's not part of phase one? Well, I take the position that that was the beginning of the Amazon air cargo facility. Okay. But let's just... And when there was a tenant, when there was a tenant, there were many more air cargo flights that were started. I have no doubt that this must be incredibly frustrating to your clients. I can't even imagine. The problem that I'm having is there were no challenges to phase one and the challenges are to phase two. But what you're talking about, though it's an amended version of phase one, is still part of phase one. Unless you explain to me why it's not, which I'm happy to hear and I'm giving you a chance to do, it seems to me like it's still part of phase one, the 2018 things. I mean, even at 2019, I mean, in 2019, Lakeland considered a ground lease of the air cargo area to Amazon. And these terms, I mean, it's not an FAA issue, but these terms were debated at a public meeting. And then the public was allowed an opportunity for comment and the Lakeland City Commission unanimously approved the lease. It seems like the real problem here may be with the Lakeland City Commission. I mean, why is this not a part of phase one? It's not part of phase one because in the 2016, there was no tenant involved. It was aspirational, if you will, that they would find a tenant for a small air cargo facility. The 2016 EA was more interested in what we call maintenance repair and overhaul facilities, the hangers that do repairs on large aircraft. The air cargo facility was meant to accommodate some small air cargo facility and certainly not had no intention of being a 640,000 square foot facility that Amazon now wants at Lakeland. So let me ask you something. Maybe I'm just misunderstanding your argument. Maybe I don't need to put it in a box, but for me, we have phase one and we have phase two. Are you saying that these things that occurred before phase two are actually part of phase two? Are you saying that there's a separate phase, maybe a phase 1A? But what exactly? I just want to make sure I'm understanding what you're- They're all a part of the same project, and that is to bring an Amazon air cargo facility to Lakeland Linear Airport. That is the project. That implicates segmentation issues, that implicates- I'm sorry. The problem with that for me, and I understand you're getting frustrated, but I want to make sure that I'm understanding your argument so I can give it fair attention. The problem I am having is in sort of sorting this out into the right legal box, okay? And I'm sorry if it's a little pedestrian, but I don't know how to analyze it because it seems to me like all of this predated phase two and phase one has already finished. You can't challenge phase one anymore. You've conceded you can't challenge phase one. How did these things that happen, even though part of an amended phase one, in phase one somehow become part of phase two? What is the administrative mechanism for that being the case? Are you saying it was arbitrary and capricious for it to be handled as part of phase one? I'm trying to understand. I'm trying to ask you to put it into sort of legal speak for me. Okay. So, these prior actions have a place in determining whether or not the cumulative effects were properly analyzed and whether or not the respondents segmented an entire project into smaller projects that were broken down in order to evade proper NEPA analysis. So, I understand you're arguing that you can't segment a project, but when phase one is complete, how can you, how do you argue that that is then phase two improper segmentation? Well, my argument is that the 50,000 square foot facility that was the subject of the 2016 EA was never built. It was never built. It was never, there was never a tenant and it didn't go anywhere for two years. Then a tenant, so the real beginning of this project occurs in 2018 when the city of Lakeland acquires a tenant and asks for a 233,000 square foot facility and eight air cargo flights a day. They're two separate projects, two separate projects. But that 2018 reassessment has been built and it's completed. Correct. And that 2018. So, how is that an improper segmentation if we now move on to phase two? Because at the time that that revalidation, the secret revalidation was implemented, there was no public comment. There was no public acknowledgement. There was already an interest, Amazon already knew that it wanted to expand their cargo facility and did so almost immediately after it signed the lease. Can I ask you a quick question? Before the facility. So, you say Amazon knew that it wanted to do this. One question I've been trying to figure out with the improper segmentation argument that you're making in the briefs is, should we be looking at what Amazon knew that it wanted to do or should we be looking at what the FAA had in front of it to decide whether the FAA improperly segmented its review? Certainly what the FAA knew about Amazon's intentions is not in the record. Neither is the intentions of the City of Lakeland. We do know, however, that at the time that the 2018 revalidation was first implemented, that the construction of the 22,230,000 square feet facility hadn't yet been completed before this proposal began. What is the relevance? So, they hadn't completed the Phase 1, basically, and then they started the Phase 2. So, the FAA was well aware that the proposed project was in the works, even as the revalidated Phase 1a, if you will, had not become operational. Okay. So, just so I understand, the point then being that the FAA could have said when we got this issue in front of it, oh, we're improperly segmenting this because there's ongoing construction already at this facility, something like that? There's ongoing construction. There are other projects that are part and parcel of this project, the lighting, the CAT-3 ILS lighting, the rehabilitation of the taxiways, the rehabilitation of the runways. These were all part of one larger project to bring Amazon a substantial air cargo facility at Lakeland Lunar Airport. Thank you, Mr. Caber. I'm sure you've reserved three minutes for rebuttal. Thank you. Ms. Katsalas. Good morning, and may it please the Court. My name is Anna Katsalas, and I represent the Federal Aviation Administration, or FAA. Counsel for the City of Lakeland, Sarah Judkins, will argue for two minutes of respondent's time, and also with us at council table today is Stephen Ossett for the City. I would like to address two main points with my time today. First, petitioner's claims are not reviewable for two independent reasons. Petitioners failed to establish Article III standing to sue, and also failed to exhaust their administrative remedies, which is a statutory prerequisite to the suit. Let me start with the standing issue. I just, I don't agree with you on that, but I might be missing something, so I want to give you a chance to explain. It seems to me that they, you know, they say that they've experienced increased noise, increased traffic over their houses, increased air pollutants. Why isn't that enough to have standing here? I mean, it's an injury, it's caused by the expansion, and if we said there was a problem with the expansion, we could redress it. I think I can make just two main problems on the standing issue. One, the allegations are geographically vague, and the law is clear, for example, that it is not sufficient to oppose a project in your neighborhood or in your city. You have to make a showing that there is some impact specifically where you reside, or, you know, in an area that you enjoy. I mean, you're not seriously contesting that they're experiencing increased noise and air traffic, are you? This leads me to my second main problem with the standing issue here, which is redressability. Because yes, their standing declarations assert that they are suffering from increased noise and increased truck traffic. But of course, these declarations were prepared within 60 days of FAA's decision when phase two had plainly not been constructed. So this goes to a number of things that they've been arguing so far today. It's really about phase one. So and that's a problem for this court, because it is their obligation and their burden to establish with facts in the same level as... I mean, I'll tell you what, I don't... Here's why I don't agree. It seems to me they clearly have established it with respect to phase one, even though phase one is not an issue. And we all agree that phase two just increased all of those things. I mean, it just seems pretty clear to me that they have an injury in fact, they have causation, and they have redressability. What am I missing? Well, respectfully, I think it's the two main points that I've mentioned. It's vague geographically, it doesn't actually establish that. And it also plainly doesn't establish that their injury... How is it vague geographically? They've said they've experienced these increases in flights and air pollutants, et cetera. They don't establish, for example, that these flights are going over their homes or over an area they established. They have said they've experienced an increase in noise. Right. And you're welcome to spend your time on this if you want. I'm not going to tell you how to spend it, but it's clear to me that they're standing. We don't feel that we need to spend much more time on that. We just think that the declarations don't establish. And the biggest problem is it doesn't establish that it's from phase two. How could it ever be from phase two? I mean, it just seems... Because phase two hasn't happened yet. It could actually... It could certainly be. They could have a declaration, for example, Your Honor, that says the flight procedures that will happen here will send flights over our home, they will do this. They can know these things from the record. They just didn't do the work in this case. So why is it... And this is the only question I have about this is, why isn't their statements about phase one saying, we're disturbed by these flights and there's noise and whatnot, there's traffic, given that phase two is to increase the number of flights and the amount of cargo, why isn't it just sort of a reasonable inference that they will have an increase in disturbance? I think if this is the last point I'll make on standing, it's just that that's not... That doesn't satisfy a petitioner's burden on standing. They actually have to produce the facts and the evidence to show that. It's not for the court to sort of speculate. Well, I guess I'm not speculating, I'm just saying a reasonable inference. I mean, it's very odd because we're not usually fact finders, you know, like we don't usually find the facts, but it seems like we have to do that here. And if I'm supposed to find, like, as a matter of fact, it seems like one reasonable inference from these bad things are happening to me now, you're going to do even more of them in the future. Therefore, I can challenge the thing you're going to do in the future. That just seems like reasonable. We would say that the court shouldn't have to piece this together and sort of make that chain of inference. It should be established. But, you know, another point and another reviewability issue is that petitioners failed to raise any of the issues that they seek to raise before this court, before FAA during the administrative process, and also established reasonable grounds for not doing so. Pursuant to 49 U.S.C. 46110D, this court accordingly cannot consider the issues. Can you address an issue? So you raised this in your brief, and then they responded to it in their reply brief, and you didn't have an opportunity to respond to their response, but they cite a case, D.R.T. versus Public Citizen, from the United States Supreme Court, and say that the Supreme Court has said that people don't need to raise obvious flaws in the NEPA process in order to bring a NEPA challenge. Yes. I can. So in that case, actually, the Supreme Court held that the plaintiffs had forfeited an argument that the agency had not properly considered alternatives, where the plaintiffs had not identified any alternatives they wanted the agency to consider in their comments, or even urged the agency to consider alternatives. That is precisely the situation here. We have, you know, if it were, I mean, if it were the case, I mean, they've made the argument in the reply brief that FAA knows its NEPA obligations, generally speaking. If that were sufficient, then the statutory requirement would be completely meaningless. And we have also searched through all of the public comments. We have found, obviously, there were some that opposed this project, expressed concerns about this project, but we have not found a single comment raising any, and petitioners have identified none, raising any semblance of the segmentation, cumulative impacts, issues that they seek to raise before this court. You know, the point of this, the point of this, the exhaustion requirement is to give the agency an opportunity to address the concerns. I mean, and even more broadly, we haven't found any issue raising concerns about the process, generally. Well, let me, let me ask you about that. In the draft EA that was publicized for public comment, correct me if I'm wrong, but it's my understanding that there was no segmentation analysis. It was only in the final version. Is that correct? I think you may be referring to cumulative impacts. Okay. So there's no cumulative. So, okay. Yes. Thank you for correcting that. So there's no cumulative impact section, it only appears in the final, correct? Correct. So how, if you're saying the public comment process is necessary, they have to have exhausted, they have to have raised these issues in the public comment so the agency has a chance to respond. What about the fact that the agency didn't put that in the draft EA so that the public would have a chance to comment? And this kind of dovetails with the argument that, in fact, the FAA knows what its NEPA obligations are. It included it in the final EA, but it wasn't put forth in the draft for the public to comment on. So, yes, I will answer that question if I could finish answering Judge Brasher's question about the Department of Transportation case. Just to wrap up, it's dicta in that case, they actually found a failure to exhaust. And we have cited that case and found no instance of this court applying that dicta. So, but to go to that point, I think it's, you know, it's unfortunate that there was not a cumulative impacts analysis in the draft EA in this case. But I also think it's significant that no member of the public had any concern about that. I mean, I would think if a member of the public were concerned about cumulative impacts and they thought that FAA was not going to raise that or had not adequately addressed it, they would say, FAA, you have to address cumulative impacts in this case. Counsel, didn't they, didn't members of the public talk about how they were concerned about the additional impacts of more flights? I mean, didn't they address that issue? And I realize it's not the same exact thing as segmentation, but effectively they're saying, look, it's so bad already and now you're going to be adding more flights. It's just going to become even more unbearable. I mean, doesn't that sort of get at the issue of the cumulative effects here and segmentation in some way? And if so, I mean, it seems to me that that's enough under the case law, which talks about how, you know, the agency just has to have a fair opportunity to address it. Well, respectfully, I think the answer to that is that FAA responded to all of those comments. You know, there's a handy chart, actually, in extracts 29, I think, that lists sort of breaks down every single comment FAA received. And, you know, and you can go through and see how FAA responded to them all. But I think certainly FAA responded to the comments about noise. It explained its noise analysis. It explained how this project will impact noise contours and the way that it does its noise analysis. So it addressed those comments. But there, I mean, to say that they preserved the issue of there's something more that FAA had to do, there's sort of a cumulative impact that FAA missed in that analysis. That was never raised. So I think there is, I mean, I think that the exhaustion point is. Just what would they have to have done? Because I'm having a hard time conceiving what, you know, given that this process is sort of an ongoing process, you do these sort of proposed and then you do, you get comments, then you do a final. What are you supposed to say during that comment process that would allow you to bring in a claim like this one? Well, I think, Your Honor, if there is a concern, and again, there's a difference between just being concerned about noise and having an issue with the adequacy of FAA's cumulative impacts analysis. I think you would have to do something to put the agency on notice that you have that concern and that it's different. I mean, again, the agency responded to the concerns about noise. Let me ask you sort of a pragmatic question. I mean, these people, you know, generally are not going to be represented by counsel. This is an administrative agency action. We want people to feel like they can air their grievances so that the administrative agency has an opportunity to consider them, make changes if appropriate, and if not, explain why. I mean, just as a practical matter, for them to have raised the word, the magic word, segmentation, right, like that's just not sort of a common knowledge type of thing that a lay person would know. And didn't they get to that same core concern without invoking the magic word of segmentation? I mean, isn't that something we should be taking into consideration here? I understand your point. And I think the general, you know, question is, did they say enough to put the agency on notice that these are the concerns? Did FAA know that there were concerns about noise? Absolutely. Did it address those concerns? Absolutely. That's a different issue, though. So I think it goes to the question of, did they know? If I could make a couple of points. Let me ask you one quick question, though, about in public citizen, the U.S. Supreme Court said the agency bears the primary responsibility to ensure that it complies with NEPA. And an EA's flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action. I don't know how that doesn't fully address the exhaustion argument you're making. Well, as I said previously, that's actually dicta, and they found a failure to exhaust in that case because the plaintiffs hadn't raised an issue about the adequacy of alternatives before the agency. That's also quite a legal thing. I mean, you know, you have an obligation to consider alternatives that maybe a member of the lay lay public might not know, but the Supreme Court found a failure to exhaust in that case. If I can make a couple, I'm running. I just don't think you answered my question. What what what do they have to say? I mean, I really am like, what is the comment supposed to say? You keep saying, like, they have to put us on notice and stuff. I'm just trying to figure out, like, what do they have to say? On cumulative impacts, for example, Your Honor, if the argument is that FAA's noise analysis failed to account for something cumulative, it would have to put the agency on notice that you have that problem with the analysis. It's different. And again, I mean, it's to say we are concerned about noise that that happened. I mean, can you just like this is literally the question I have. I mean, can you tell me what the comment is supposed to say? I mean, I just want you to just give me a hypothetical comment that is sufficient to put them. Well, in this instance, I think it would have said you didn't consider cumulative impacts at all. And I do think that I do have to use the word cumulative impacts. Well, you didn't you didn't. No, they would not have had to use the term, but you didn't consider sort of the aggregate effect or the combined effect. Your noise analysis failed to consider something. It would have had to give the idea of it. It would have had to put the agency on notice of the idea that there is this problem with the analysis. Like if he had filed a comment that used the frog in the pot of boiling water with that this all of this construction is going on and it just keeps adding up and adding up and adding up and it's causing serious problems. Would that be sufficient? Uh, I, I am not sure. I think probably that would have been sufficient. Your Honor. I would also say they did not raise any of these issues about phase one is in fact, phase two. We're hearing that for the first time in this courtroom today that this is, you know, that these were, um, you know, was in fact phase two and these arguments. So I do think there is a failure to exhaust. I'm, I'm over time. Let me, um, on, okay. You have said you have conceded that there was no cumulative effects section in the draft EA. So if there had been, um, a cumulative effects section that was incomplete, I could understand why there might be an argument that a, that somebody needed to provide a comment to the agency. It seems a bit disingenuous to say there's no exhaustion here because you failed to point out that the agency failed to include a section in its analysis that is required by NEPA. That seems to be a bridge, a much further bridge than, than the case law I've seen. Okay. I mean, I think then if, you know, sort of in the alternative, um, that is the only issue that they preserved of their issues. Um, and I think that, you know, again, I think, I think it would be fair for members of the public who were concerned about this to raise it, um, and not come to court and raise it for the first instance. But I also think, um, you know, there is a robust cumulative impacts analysis in the final EA. Um, it's an extensive analysis. It took into account every action for which the agency had previously, um, issued, um, a categorical exclusion. I mean, I think we pointed out in our brief that it looked at the impacts, um, of 40 other projects past, um, present reasonably foreseeable within a five mile buffer and a five year period. Um, so I think that any failure to include this in the draft EA, um, was harmless error because we're looking at the final, the final one in this instance, and there is no, there is no, there is no problem. Um, and I think that, you know, petitioners have not adequately actually characterized the, the robustness of this cumulative impacts analysis. Thank you, counsel. Thank you. All right, Ms. Judkins. Good morning, Your Honors. May it please the court. My name is Sarah Judkins with Kaplan Kirsch and Rockwell on behalf of the City of Lakeland as an intervenor respondent. The City of Lakeland has been working to develop air cargo operations at the Lakeland Linder International Airport for over eight years. The petition before this court, however, challenges only the sufficiency of the environmental assessment for the most recent project, an expansion of the air cargo facility. At every step of the way, the City kept FAA and the public informed, sought input and advice from FAA, operated with the best available knowledge and in good faith to ensure that an appropriate environmental assessment under NEPA was conducted for the expansion project. The FAA properly evaluated the cumulative impact of the expanded project by including the noise impacts from the air cargo facility in the environmental baseline as NEPA CEQ regulations expressly permit. The initial air cargo facility was not a committed action because it was substantially completed prior to the initiation of the expansion project and because it has independent utility. And FAA was not required to conduct a HAPS analysis under NEPA or its own internal guidelines. FAA and the City did everything they were required to do under the law. If this court has any questions for the City, I'm happy to answer them. Otherwise, this court should deny the petition for review. Thank you, Counsel. Thank you, Your Honors. Mr. Caper, you have three minutes. Thank you, Your Honors. I have just a couple of points and then I'll sit down. First of all, with respect to the exhaustion of remedies issue, not only did they not include cumulative impacts section in the draft EA, which they didn't have the opportunity, the residents, people affected by this project didn't have the opportunity to comment and provide public participation on the cumulative impacts analysis that the FAA did provide in the final EA. And that's sort of one of the larger questions in this case is that there is a lot going on behind the scenes that the public is not unaware of. And this goes back into the segmentation argument, particularly with respect to exhaustion specifically and more generally into our segmentation argument. That is, this project, when it was proposed, the draft EA came out. It was the first time that the public was made aware of the other projects surrounding this project. That is, the strengthening of the runways and the rehabilitation of the taxiways and of the revalidation. Because of the methods that the respondents used in order to approve these, the public was unable to give its comments and to assess what the impact would be and to come up with comments that would provide the respondents with a reasonable basis to make a decision on whether or not this project would have a significant impact on the environment. And for that reason, I think that this petition, or excuse me, this proposed project is arbitrary and capricious and the petition for review ought to be granted. And with that, if you have any further questions. Thank you, Council. Thank you very much.